### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

ABIEL BRATHWAITE,

> *Plaintiff,*

v.

ANTHONY GEORGIADES, *et al.,*

> *Defendants*

No. 23-cv-277-ABA

### MEMORANDUM OPINION

On the evening of December 5, 2022, Plaintiff Abiel Brathwaite drove to a parking lot at Baltimore/Washington International Thurgood Marshall Airport ("BWI") to purchase food from a food cart parked at the lot. While waiting in line, he felt threatened by another patron's dog, and pulled out a gun. Mr. Brathwaite called 911, and after police arrived, Mr. Brathwaite was detained for about an hour, after which he was released and was not charged with any crime. He brought this civil action, contending that the officers who were involved violated his rights under the Fourth Amendment of the U.S. Constitution, and Maryland law, in detaining him, searching him, and temporarily seizing his firearm.

### BACKGROUND

Because Defendants Anthony Georgiades, David Splat, and Justin Ambush ("Defendants") have moved to dismiss Mr. Brathwaite's complaint at the pleadings stage, the Court assumes all of Plaintiff's allegations are true, and draws all reasonable inferences from those allegations in Plaintiff's favor.

*See, e.g.*, *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). The Court also accounts for the fact that Mr. Brathwaite is proceeding *pro se*. In his complaint, ECF No. 54 ("Compl."),[1] Mr. Brathwaite alleges as follows:

One of the parking lots at BWI, located at 101 Scott Drive, is the "Cell Phone Lot." Compl. ¶ 1; *id.* at 4.[2] As explained below, the BWI cell phone lot, although not contiguous to the airport terminal, is part of the airport.[3] It is located just past the end of the airport runway, and adjacent to the airport daily parking garage. ECF No. 55-3.[4] According to Plaintiff's complaint, there is a halal food cart that sometimes operates from that lot. Compl. ¶ 1.

Mr. Brathwaite alleges that he arrived at the lot around 7:30 p.m. on December 5, 2022, to purchase food from the food cart. *Id.* ¶ 1. He ordered his food while sitting in his car, and then parked and exited his vehicle. *Id.* While awaiting his turn to pay, he "observed a female named Danuta Wilson in front of the cart purchasing food with a large black dog at her side." *Id.* ¶ 2. He "eventually observed that the dog was off leash and became very concerned for

---

[1] Mr. Braithwaite filed this action on February 1, 2023. ECF No. 1. He filed a corrected complaint, amended complaint, and corrected amended complaint on February 3 and 6, 2023, respectively. ECF Nos. 5, 6. Judge Rubin granted two subsequent motions for leave to file amended complaints. ECF Nos. 24-25 & 53-54. The Third Amended Complaint, ECF No. 54, is the operative complaint.

[2] References to page numbers of filings herein refer to the page numbers generated by this Court's ECF system in the header of the parties' filings.

[3] The "cell phone" lot bears that moniker because it is designated as a place for individuals to park while waiting for passengers to land and call them to be picked up, presumably to avoid congestion in the passenger pickup areas.

[4] *See Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (noting that matters of public record may be considered on a motion to dismiss under Fed. Rule 12(b)(6)).

[his] safety." *Id.* He alleges that "[w]ithout any provocation, the dog approached [him] and launched at [his] foot in an aggressive manner." *Id.* ¶ 3. He alleges he was in "fear of grievous bodily harm and being mauled," and that as a result, he "retreated and drew [his] licensed firearm pointing it down and in a safe direction fearing further attack." *Id.*

As explained below, firearms are prohibited in all parts of BWI, including the parking lots, other than by law enforcement officers, by airplane passengers specifically authorized to carry weapons aboard aircraft, and by licensed armored transport services servicing the airport. *See* Discussion § I, *infra* (citing Md. Code Regs. 11.03.01.09(c)(1)-(2) & 11.03.01.01(B)(5), (55)).

In any event, after Mr. Brathwaite pulled out his firearm, he "politely asked" Ms. Wilson to "secure her dog and stated to her that it had just attacked [him]." *Id.* ¶ 4. Ms. Wilson restrained the dog, and got into her vehicle with the dog. *Id.* Mr. Brathwaite "secured [the] firearm back in [his] pocket holster and concealed it in [his] front right pants pocket." *Id.* Ms. Wilson left the parking lot with the dog. *Id.* Mr. Brathwaite then "immediately called 911" and remained on the scene. *Id.* On the 911 call, which Plaintiff submitted in connection with his opposition to the motion to dismiss, and which was referred to and thus incorporated into the complaint, Compl. ¶ 4, 10, *see Gaines v. Valley Community Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016), he stated "I am at the BWI Cell Phone Lot. This lady had a dog loose. The dog came at me, so I pulled out a firearm. I held it down; I didn't point at anyone . . . she held the dog and put it back in her car." ECF 58-9.

Meanwhile, it turned out Ms. Wilson's husband had been present in the lot when Mr. Braithwaite pulled his gun, or arrived shortly thereafter. *Id.* ¶¶ 11-12. Having arrived in a different vehicle from Ms. Wilson, the husband remained at the lot after Ms. Wilson left. *Id.* ¶ 11. Before police officers arrived, the husband approached Mr. Brathwaite and asked if he "was law enforcement." *Id.* Mr. Brathwaite did not (yet) know that the man was Ms. Wilson's husband; Mr. Brathwaite "took [his] phone out and began recording, fearing that this individual may be up to no good." *Id.* The husband (whose name does not appear in the record) then "got into his vehicle with headlights on and drove it toward [Mr. Brathwaite's] vehicle and parked facing it." *Id.*

At that point, three Maryland Transportation Authority police officers—Defendants Georgiades, Splat, and Ambush—arrived at the scene. The husband "began saying loudly 'the man got a gun right here,' . . . 'he pulled it on my wife.'" *Id.* ¶ 12. Mr. Brathwaite, who had made the 911 call, told Officer Georgiades, "I have a licensed firearm." *Id.* ¶ 14. Officer Georgiades then "aggressively twisted [Plaintiff's] right hand and shoved his hands in [Plaintiff's] waist searching for [the] firearm." *Id.* Mr. Brathwaite told Officer Georgiades that the gun was in his pocket; Officer Georgiades retrieved it, and then Officer David Splat conducted a "full pat-down" during which Mr. Brathwaite was "cooperative and followed all instructions." *Id.* ¶ 14, 16. Mr. Brathwaite "explained [his] side of the story" and voluntarily provided his driver's license and "Wear and Carry Permit." *Id.* ¶¶ 23, 24.

Mr. Brathwaite contends he then saw Ms. Wilson's husband attempting to open the door of Mr. Brathwaite's car. *Id.* ¶ 26. At Officer Georgiades's request, Officers Spalt and Ambush then restrained Mr. Brathwaite in handcuffs and placed him in one of the police vehicles. *Id.* ¶¶ 27-30. Mr. Brathwaite alleges that from the back of the police car he saw Defendants Georgiades and Ambush "chatting with the dog owner's husband and laughing." *Id.* ¶ 32. "At one point, Officer Ambush came to the police vehicle asking me if I was afraid of dogs, to which I replied that I do own a dog and that I had been attacked by the woman's dog." *Id.*

Officer Georgiades initially said that Mr. Brathwaite would be "charged with brandishing a firearm" and that his firearm would be taken away. *Id.* ¶ 33. Mr. Brathwaite alleges, "At [that] time, I began explaining to him that the dog had attacked me and that I feared for my life." *Id.* ¶ 34. He then requested that the officers loosen the handcuffs, which they did, although he "continued to experience discomfort" in his wrist. *Id.* ¶ 36.

After Mr. Brathwaite had been in the police vehicle for an hour and five minutes, Officer Georgiades told Mr. Brathwaite that the dog's owner "said you never pointed the gun at her nor the dog" and did not want to "press charges," and that Mr. Brathwaite was free to leave. *Id.* ¶ 37. Officer Spalt removed the handcuffs, and Mr. Brathwaite completed a written witness statement. *Id.* ¶ 39. The officers then returned the firearm to Mr. Brathwaite. *Id.*

Some time later, Mr. Brathwaite made a request pursuant to the Maryland Public Information Act, and obtained documents related to the

incident, including a Police Incident Report. *Id.* ¶ 40. In the report, Officer Spalt reports that the camera footage from the incident showed that "the dog ran towards Mr. Brathwaite," who then "stepp[ed] backwards away from the dog as it approache[d] him." *Id.* ¶ 42. Mr. Brathwaite alleges the report, however, contains "multiple false statements and allegations," specifically that he was "told to keep his hand[s] up" (which Mr. Brathwaite denies); that the husband alleged that Mr. Brathwaite had "pointed a gun at his wife and dog" or "waved" the gun around (whereas, according to Mr. Brathwaite, the husband "never used the words 'pointing' or 'waving'"); that Mr. Brathwaite had a "gun on his hip" (as opposed to his pants pocket); that the officers had "checked" his wrists when they loosened the handcuffs (he alleges they did not); and that the dispatch that summoned the officers "advis[ed] a subject pulled out a firearm at a dog and its owner" (whereas Mr. Brathwaite contends the dispatch "made reference to the firearm being pulled on the dog"). *Id.* ¶ 41.

Mr. Brathwaite filed this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated the First and Fourth Amendments of the U.S. Constitution, Articles 24, 26 and 40 of the Maryland Declaration of Rights, and state tort law. His thirteen causes of action fall into five categories:

- **Seizure claims** (against all Defendants) – Plaintiff alleges that detaining him for an hour and five minutes constituted an unconstitutional seizure in violation of the Fourth Amendment of the U.S. Constitution (Count 1) and Articles 24 and 26 of the Maryland Declaration of Rights (Count 6).

- **Search claims** (against Georgiades) – Plaintiff alleges that the pat-down constituted an unconstitutional search in violation of the Fourth Amendment (Count 2) and Article 26 of the Maryland Declaration of Rights (Count 7).

- **Free speech claims** (against Georgiades) – Plaintiff alleges that the seizure constituted retaliation, in violation of the First Amendment (Count 3), and Article 40 of the Maryland Declaration of Rights (Count 8), for Mr. Brathwaite having told Officer Georgiades that Ms. Wilson's husband was at the car.

- **Conspiracy-related claims** – Plaintiff alleges that although Officer Georgiades was the one who "effectuat[ed] an unlawful arrest of the Plaintiff without probable cause," Officers Spalt and Ambush "failed to intervene and prevent the wrong doing of Officer Georgiades" (Count 4, against Spalt and Ambush), and all Defendants "conspired . . . to deprive Plaintiff Brathwaite of his rights under the United States Constitution" (Count 5, against all Defendants).

- **State law tort claims** – Finally, Plaintiff alleges that all Defendants committed the torts of false light (Count 9), battery (Count 10), negligence (Count 11), gross negligence (Count 12), and civil conspiracy (count 13).

As relief, Plaintiff seeks compensatory damages, punitive damages, and court costs. Compl. at 27.

7

## STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). As noted above, in considering such a motion, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212. A motion under Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

Where, as here, a plaintiff proceeds *pro se*, the Court holds his complaint to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 390 (4th Cir. 1990) ("[C]ourts traditionally view civil rights complaints, particularly those brought pro se, with 'special judicial solicitude.'") (citation omitted). "[L]iberal construction," however, "does not absolve Plaintiff from pleading a plausible claim," *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 314 (D. Md. 2014).

**DISCUSSION**

Defendants contend that, even accepting all of Plaintiff's allegations as true, the complaint does not state any claims on which relief can be granted. The Court agrees and, for the following reasons, grants Defendants' motion.

## I.    Plaintiff's Seizure-Of-Person Claims (Counts 1 and 6)

In Count 1, asserted under 42 U.S.C. § 1983, Plaintiff alleges he was seized in violation of the Fourth Amendment when he was "detained, and denied the opportunity to leave[,] without reasonable suspicion or probable cause." Compl. ¶ 44. Count 6 alleged that seizure also violated Articles 24 and 26 of the Maryland Declaration of Rights. These claims can be analyzed together, because Article 24 and 26 of the Maryland Declaration of Rights are interpreted *in pari materia* with the Fourth Amendment. *See, e.g., Littleton v. Swonger*, 502 Fed. App'x 271, 274 (4th Cir. 2019).

As an initial matter, the parties dispute whether Defendants effectuated a full-blown arrest or instead a *Terry* stop. *See United States v. Davis*, 383 F. App'x 269, 274 (4th Cir. 2010) (explaining that "a *Terry* stop becomes a custodial arrest not because of the degree to which officers restrict the suspect's liberty, or the means they employ to do so, but rather as a result of the duration of the stop."). Plaintiff alleges he was "arrested." Compl. ¶ 28. Because Defendants' motion arises at the pleadings stage, where Plaintiff's allegations are accepted to be true, the Court assumes without deciding that Mr. Brathwaite was under arrest during the hour and five minutes Defendants held him in the police vehicle. *See* Defs.' Mot. at 10 n.4 ("Defendant Officers do

not concede that they arrested Mr. Brathwaite; any arrest is assumed *arguendo* in this procedural posture based on the Third Amended Complaint.").

Under Maryland law, second-degree assault includes "(1) intent to frighten, (2) attempted battery, and (3) battery." *Jones v. State*, 440 Md. 450, 455 (2014) (citation omitted). "A defendant commits second-degree assault of the intent-to-frighten type where: (1) 'the defendant commits an act with the intent to place a victim in fear of immediate physical harm; (2) 'the defendant has the apparent ability, at the time, to bring about the physical harm'; and (3) 'the victim is aware of the impending' physical harm." *Id.* (cleaned up, quoting *Snyder v. State*, 210 Md. App. 370, 382 (2013)). A person commits attempted battery if the person "had a specific intent to cause physical injury to the victim" and took "a substantial step towards that injury." *Snyder*, 210 Md. App. at 382. And specific intent can be proven circumstantially. *Jones*, 440 Md. at 455.

Probable cause is determined by a "totality-of-the circumstances" approach. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed an offense." *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017) (cleaned up). "The probable-cause inquiry turns on two factors: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" *Smith v. Munday*, 848 F.3d 248,

253 (4th Cir. 2017) (quoting *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016)). The analysis of whether there was probable cause to arrest is necessarily objective. "[T]he probable-cause inquiry 'examine[s] the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; [courts] do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause.'" *Smith*, 848 F.3d at 248 (quoting *Graham*, 831 F.3d at 185).

Here, even accepting all of Plaintiff's allegations as true, at the time Defendants detained Mr. Brathwaite, the dispatch report, plus the husband's in-person report, plus Mr. Brathwaite's own statements to the officers, together established probable cause that Mr. Brathwaite had committed second-degree assault. When Defendants arrived at the BWI cell phone lot, they had received a report that "a subject" had "pulled out a firearm at a dog and its owner." Compl. ¶ 41. That "subject"—Mr. Braithwaite—had himself been the person who called 911, and had reported to the 911 dispatcher "I pulled out a firearm. I held it down; I didn't point it at anyone. I held it down." ECF 58-8. When the officers arrived, the dog owner's husband (who at that time the officers simply knew was a male at the scene) pointed toward Mr. Brathwaite and said "the man got a gun" and "he pulled it on my wife." Compl. ¶ 12. And Mr. Brathwaite immediately and expressly confirmed to the officers that he was in possession of a firearm ("I have a licensed firearm."). *Id.* ¶ 14. These facts establish that Defendants had probable cause to arrest him.

The officers thereafter decided either that an assault had not occurred, or after hearing that Ms. Wilson was not interested in "press[ing] charges" exercised their discretion not to arrest him. Regardless, at the time Mr. Brathwaite was placed in handcuffs in the police car, the facts as alleged in Plaintiff's complaint itself or incorporated therein established reasonable, articulable suspicion that Mr. Brathwaite had committed second-degree assault in violation of Md. Code Ann., Crim. Law, § 3-203.

Defendants contend there is another, further basis for finding that they had probable cause to arrest Mr. Brathwaite: that he possessed a firearm on property that is part of BWI, and the Maryland Aviation Administration ("MAA") regulation governing "Airport Security" provides that all "[w]eapons, except those properly packaged for shipment, are prohibited." Md. Code Regs. 11.03.01.09(c)(1); *see also* Md. Code Regs. 11.03.01.01(B)(5) (defining "Airport" as "Baltimore/Washington International Thurgood Marshall Airport (BWI), owned by the State of Maryland and operated by the Maryland Aviation Administration, as it exists or may be developed."); Md. Code Regs. 11.03.01.09(c)(2) (providing that the only exceptions to the prohibition on possession of "weapons" at BWI are for law enforcement officers (and even then only "if weapons are required in performance of their duties"), "[e]nplaning and deplaning passengers authorized by 49 CFR § 1544.219 to carry weapons aboard aircraft," and "[u]niformed employees of licensed armored transport services under contract to any tenant of the Airport carrying handguns when actually transporting monies or valuables."). Defendants further point out that

the BWI cell phone lot, adjacent to the BWI daily parking garage, and just across the street from the BWI runway, is located on land comprising "Baltimore/Washington International Thurgood Marshall Airport (BWI), owned by the State of Maryland and operated by the Maryland Aviation Administration, as it exists or may be developed." *See* Md. Code Regs. 11.03.01.01(B)(5); *see also* ECF No. 55-3 at 2 (BWI map); ECF No. 55-3 at 3-4 (satellite images of BWI). They also point out that so long as such offense is committed "in the presence or within the view of" a police officer, it is an arrestable offense. Md. Code, Crim. Proc. § 2-202(a), (b) (authorizing warrantless arrests of persons whom a police officer has "probable cause to believe" has "committed or attempted to commit [a] felony"). And Plaintiff's allegations establish that he readily admitted at the time, both when he called 911 and once Defendants arrived at the scene, that he possessed a firearm on the property of the BWI cell phone lot.

But the Court need not (and does not) decide whether Mr. Brathwaite's possession of the firearm in fact violated the prohibition on "weapons" at BWI, Md. Code Regs. 11.03.01.09(c)(1), or whether, in the absence of probable cause that Mr. Brathwaite had committed a second-degree assault, his possession of a firearm would have justified an arrest. (As Mr. Brathwaite points out, it does not appear Defendants were even aware that possession of a firearm is prohibited in the BWI parking lots.) That is because Defendants had probable cause to believe that Mr. Brathwaite had committed a second-degree assault by pulling out his firearm. Accordingly, Defendants had probable cause sufficient

to arrest him, and Counts 1 and 6 do not state claims on which relief can be granted.

Mr. Braithwaite's remaining arguments to the contrary are beside the point, or unavailing.

First, he argues the firearm prohibition set forth at COMAR 11.03.01.09 should be construed to apply only to "sterile areas" within the airport itself, *i.e.* the areas past TSA security checkpoints, or that at minimum there is a "factual dispute" about whether the weapons prohibition applies to the BWI cell phone lot. Opp. 2, 12-14. He also argues that even if he was in fact prohibited from possessing a firearm at BWI, he did not know that, because "[n]o signs are posted conspicuously on the Cellphone Lot." Opp. 18 n.12; *see also* Opp. 15 ("Had COMAR 11.03.01.09(C) meant to be applicable to outside the airport, the MAA . . . would have posted signs at the Cellphone Lot."). Because the arrest was justified based on probable cause for second-degree assault, the Court need not reach the question of whether the BWI firearm prohibition applies to the cell phone lot, or whether a person entering the lot would have been on notice that firearms are prohibited there.

Second, Mr. Brathwaite argues that probable cause was lacking because the husband's allegations were not "suitably corroborated and the reliability of the person [was] unknown." Opp. 27. But even anonymous tipsters' information can be sufficient for probable cause, so long as "suitably corroborated" and "exhibit[ing] sufficient indicia of reliability," as Plaintiff acknowledges. Opp. 28 (quoting *United States v. Massenburg*, 654 F.3d 480,

486 (4th Cir. 2011)). And here, the husband was present, identified himself as

an eyewitness, pointed to Mr. Brathwaite, and stated that Mr. Brathwaite had

"a gun" and had "pulled it on my wife." Compl. ¶¶ 11-12. These facts

distinguish the information from that of an anonymous tipster. *See United*

*States v. Mitchell*, 963 F.3d 385, 391 (4th Cir. 2020) ("The basis of the

bystander's knowledge—his or her presence at the location of the fight—

strongly supported the tip's reliability."); *United States v. Griffin*, 589 F.3d 148,

152 (4th Cir. 2009) (noting that a bystander's tip is more reliable when

"reported to the police in public, exposing [the bystander] to retaliation from

the suspect and increasing the informant's reliability").

At least accepting Mr. Brathwaite's allegations, it appears the husband

may have exaggerated or even lied about where Mr. Brathwaite pointed his gun

when he pulled it out; Mr. Brathwaite contends it was pointed at the ground at

all times, while the husband alleged to the officers that the gun was pointed at

Ms. Wilson and/or the dog. But at the time of the seizure, the officers had been

told that Mr. Brathwaite had "pulled [a gun] on [the husband's] wife." Compl. ¶

12. And Mr. Brathwaite himself had reported to the 911 dispatcher that he had

in fact pulled his firearm out of its holster during the confrontation. Mr.

Brathwaite's's own words to the officers corroborated the husband's report that

Mr. Brathwaite possessed a firearm, which established probable cause

sufficient to justify an arrest. Regardless of whether the husband's allegations

*alone* would have established probable cause (which the Court need not and

does not decide), those allegations combined with the additional information

Defendants learned upon arriving at the scene (including from Mr. Brathwaite) established probable cause that a second-degree assault had occurred. These facts established probable cause sufficient to support the arrest.

For these reasons, Plaintiff's Fourth Amendment seizure claim, Count 1, does not state a claim on which relief can be granted. The Court need not reach Defendants' alternative argument that they are entitled to qualified immunity. And because Articles 24 and 26 of the Maryland Declaration of Rights are interpreted *in pari materia* with the Fourth Amendment, *Littleton*, 502 Fed. App'x at 274, Count 6 does not state a claim either.

## II.    Free speech claims

As noted above, in Counts 3 and 8 Plaintiff asserts that Defendants' arrest of him constituted unlawful retaliation for protected speech. "A cognizable First Amendment retaliation claim requires a plaintiff to show: (1) 'that [plaintiff's] speech was protected'; (2) 'defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech'; and (3) 'a causal relationship exists between [plaintiff's] speech and the defendant's retaliatory action.'" *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685–86 (4th Cir. 2000)).

Defendants argue that the Court's conclusion that Defendants had probable cause to arrest Mr. Brathwaite also *necessarily* requires dismissal of his First Amendment claim (Count 3) and corresponding state law claim (Count 8). Not exactly. The Supreme Court has held that the "presence of probable cause should *generally* defeat a First Amendment retaliatory arrest claim."

16

*Nieves v. Bartlett*, 587 U.S. 391, 406 (2019) (emphasis added). But it added a "narrow qualification," holding that "the no-probable-cause requirement [for such a claim] should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 406, 407. "In such cases, an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.'" *Id.* at 406 (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 99 (2018)). "For example, at many intersections, jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest." *Id.* at 407.

Nonetheless, Plaintiff's retaliatory arrest claim fails because he has not alleged facts to bring his claims within the "narrow exception" in *Nieves*. He unlawfully possessed a gun and pulled it out while waiting with other people for food from a food truck. And when Defendants arrived they were investigating an allegation by a person standing there who stated he had been an eyewitness to Mr. Brathwaite "pull[ing] it on [the man's] wife" (Compl. ¶ 12). Plaintiff's allegations must, of course, be accepted as true, and reasonable inferences drawn in Plaintiff's favor, particularly because he proceeds in this case *pro se*. But even so construed, those allegations do not present the type of

scenario where absent "protected speech" "otherwise similarly situated individuals" would not have been arrested. *See Nieves*, 587 U.S. at 407.

Accordingly, Count 3 does not state a claim on which relief can be granted. Nor does Count 8, under Article 40 of the Maryland Declaration of Rights, because the Maryland courts have instructed that it is to be construed *in pari materia* with the First Amendment of the U.S. Constitution. *Nefedro v. Montgomery County*, 414 Md. 585, 593 n.5 (2010).

## III.    Seizure-of-firearm claims

Plaintiff next claims, in Counts 2 and 7, that the Fourth Amendment and Article 26 of the Maryland Declaration of Rights prohibited Officer Georgiades from seizing Plaintiff's firearm during the hour and five minutes he was detained. These counts fail because the asserted facts establish that Defendants had probable cause to arrest him. *See United States v. Robinson*, 846 F.3d 694, 696 (4th Cir. 2017) (en banc) ("[A]n officer who makes a lawful traffic stop and who has a reasonable suspicion that one of the automobile's occupants is armed may frisk that individual for the officer's protection and the safety of everyone on the scene. . . . It is also inconsequential that the passenger may have had a permit to carry the . . . firearm."); *see also Washington v. State*, 482 Md. 395, 455 (2022) ("[T]he protections under Article 26 are coextensive with those under the Fourth Amendment.").

## IV.    Plaintiff's other claims

That leaves Plaintiff's search claims, conspiracy-related claims, and state tort claims.

18

Plaintiff's claims that Defendants were constitutionally prohibited from conducting a search of him fail because "[a] search may be incident to a subsequent arrest if the officers have probable cause to arrest before the search." *United States v. Han*, 74 F.3d 537, 541 (4th Cir. 1996). That requires dismissal of Counts 2 and 7. Because Plaintiff's battery claim (Count 10) is coextensive with his search and seizure claims, it fails for the same reason. *See Hines v. French*, 157 Md. App. 536, 551 (2004) ("Assault and battery can only occur when there is no legal authority or justification for the arresting officer's actions . . . [whether] legal justification existed in a particular case [is] judged by the principles applicable to the law of arrest.").

In Count 4, Plaintiff alleges that Officers Spalt and Ambush "failed to intervene and prevent the wrong doing of Officer Georgiades." Compl. ¶ 58. But because the claims against Officer Georgiades do not state claims on which relief can be granted, neither does Count 4. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996) (explaining that a claim that officers were "independently liable for failing to prevent" another officer's "use of excessive force" failed because the former was "derivative" of the latter, which had separately been "rejected by a jury"). So too with respect to Count 5, because a claim for "civil conspiracy under § 1983" requires, among other things, that a Plaintiff have been "depriv[ed] of a constitutional right." *Id.* at 421.

Count 9 asserts a claim for false light invasion of privacy. Maryland has adopted section 652E of the Restatement, which provides that "[o]ne who gives publicity to a matter concerning another that places the other before the public

in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other person was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514-15 (1995) (quoting Restatement (Second) of Torts § 652E (1977)). "An allegation of false light must meet the same legal standards as an allegation of defamation." *Piscatelli v. Van Smith*, 424 Md. 294, 306 (2012). And "[u]nder Maryland law, to present a prima facie case of defamation, a plaintiff must establish four elements: (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Offen v. Brenner*, 402 Md. 191, 198 (2007).

Plaintiff contends that Defendants committed false light invasion of privacy by handcuffing him and placing him in the back of a police car, and by making statements in the police reports that Plaintiff contends were false. Compl. ¶¶ 86-87. As to the arrest itself, regardless of whether an arrest can constitute a statement, and regardless of whether such statement was "publicized" or could be construed as defamatory, it is not actionable because Mr. Brathwaite was in fact under arrest (or a *Terry* stop, as the case may be), and because probable cause existed, as discussed above. *See Crouch v. City of Hyattsville*, No. 09-cv-2544-DKC, 2010 WL 3653345, at *7 (D. Md. Sept. 15, 2010) (holding that plaintiff did not state a claim for false light based on an

arrest, which was "published on the Maryland Judiciary Case Search ('MJCS')," because "he was in fact charged with a crime and the publication of that fact on MJCS was not false").

As to the statements in the police reports, assuming *arguendo* that writing a statement in a police report constitutes the level of "publicity" required for a false light claim, and accepting as true the allegations that Defendants stated falsely in the police report that Mr. Brathwaite, for example, "pointed a gun" at Ms. Wilson or "waved" his gun," *see* Compl. ¶ 41, that alternative false-light theory does not state a claim either. A false light claim requires Plaintiff to plead and prove that he "suffered harm" as a result of Defendants' alleged defamatory statements. *See Offen*, 402 Md. at 198. Plaintiff was not charged with any crime, and does not allege any other harm flowing from the statements in the police report that are even arguably independent of harm from the arrest itself (as to which Plaintiff's false-light claim fails for the reasons explained above). And although Plaintiff contends that the existence of such statements in those reports will "harm and embarrass" him in the future, *see* Compl. ¶ 87, it is Plaintiff himself who obtained the police reports and then chose to publicly file his complaint, thereby publicizing Defendants' allegations.

Counts 11 and 12 allege negligence and gross negligence, respectively. Plaintiff alleges that Defendants were negligent by (1) "committing the misconduct outlined above", and (2) "placing him in the back of a cold police vehicle handcuffed for over one hour during winter ignoring his pleas pleading his innocence and that committed no wrong and wanted to be released."

Compl. ¶¶ 94-103. As an initial matter, Defendants argue these claims fail
because there was not a "special relationship" between Defendants and
Plaintiff. Defs.' Mem. at 29 (citing *Ashburn v. Anne Arundel County*, 306 Md.
617, 628 (1986)). The principle in *Ashburn*, and the Restatement provision it
relied on, pertain to a law enforcement officer's "duty to control a *third person's*
conduct so as to prevent personal harm to another"; liability under such a
theory does require what *Ashburn* and the Restatement call a "special
relationship." *See Ashburn*, 306 Md. at 628 (citing Restatement (Second) of
Torts § 315 (1965)) (emphasis added). But here, Counts 11 and 12 do not allege
that Defendants failed to protect him from harm by a third person; they allege
that Defendants themselves were negligent. Thus, the "special relationship"
requirement does not apply. Nonetheless, those claims do not state a claim on
which relief can be granted.

        As Maryland Transportation Authority officers, Defendants have
immunity under state law for "a tortious act or omission that is within the
scope of the[ir] public duties . . . and is made without malice or gross
negligence, and for which the State or its units have waived immunity under
Title 12, Subtitle 1 of the State Government Article, even if the damages exceed
the limits of that waiver." Md. Code Ann., Cts and Jud. Proc., § 5-522(b); *see
also* Md. Code Ann., State Gov't § 12-104(2) (state waiver provisions); Md. Code
Ann., State Gov't, § 12-101(a)(2)(i) ("'State personnel' means an employee or
official of the Maryland Transportation Authority[.]"). And "'gross negligence is
an intentional failure to perform a manifest duty in reckless disregard of the

consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.'" *Stracke v. Estate of Butler*, 465 Md. 407, 419 (2019) (quoting *Barbre v. Pope*, 402 Md. 157, 187 (2007)); *see also State v. Kramer*, 318 Md. 576, 590 (1990) (defining gross negligence as "a wanton or reckless disregard for human life."). "Only conduct that is of extraordinary or outrageous character will be sufficient to imply" that a person acted with gross negligence. *Kramer*, 318 Md. at 590. Here, the complaint does not allege any facts—as opposed to bare conclusions—reasonably alleging that any Defendant officer acted with wonton disregard for the safety of others (as required for the gross negligence claim) or with malice (as alternatively required to avoid application of § 5-522(b) immunity), particularly in light of the Court's conclusion that the allegations themselves establish that Defendants had probable cause sufficient to hold Plaintiff under arrest for the hour or so it took for them to investigate and decide not to charge him with a crime.

Finally, under Maryland law "'conspiracy' is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 189 (1995). Accordingly, Count 13 will be dismissed as well.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. A separate order follows.

Date: December 12, 2024

_____
Adam B. Abelson
United States District Judge